IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

SARAH SANDOVAL                          *

    Plaintiff                           *

v.                                      * Civil Action No.: 1:17-cv-01599 PJM

THE CENTER FOR INNOVATIVE GYN           *
CARE, PC, et al.
                                        *
    Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**PLAINTIFF'S OPPOSITION TO MOTION FOR PROTECTIVE ORDER AND
MOTION TO STAY DEPOSITION FILED BY DEFENDANT, THE CENTER
FOR INNOVATIVE GYN CARE, PC**</u>

    Plaintiff Sarah Sandoval, by her attorneys, Alison D. Kohler, Henry E. Dugan, Jr.,

and Dugan, Babij, Tolley & Kohler, LLC, files this Memorandum in Opposition to the

Motion for Protective Order and Motion to Stay Deposition[1] pertaining to the videotaped

deposition of the corporate designee of The Center for Innovative Gyn Care, PC

("CIGC") and certain documents that were itemized in a request for production of

documents directed to the CIGC.  As grounds for this opposition, Plaintiff states:

    1.      This is a medical malpractice action in which Plaintiff Sarah Sandoval,

alleges that Natalya Danilyants, M.D. and her practice group, CIGC, were negligent in

failing to provide informed consent and were negligent in the performance of a

myomectomy (surgical removal of fibroids) performed by Dr. Danilyants on October 22,

2015.  See Plaintiff's Complaint (Docket No. 1).

---

[1] Defendants' Motion for Stay was granted by this Honorable Court pending resolution of Defendants'
Motion for Protective Order after the date of the deposition, which did not go forward because no witness
was produced.  Accordingly, the issue of whether a stay should have been granted will not be addressed in
this pleading.

2.      CIGC argues that it is entitled to a Protective Order that precludes the necessity of a response to certain areas of inquiry and certain requests for documents in the planned deposition of a corporate designee of CIGC.  Defendant CIGC appears to complain about inquiry into 5 general areas: (1) the content of CIGC's website in October of 2015 and the literature, studies, medical research or other medical or scientific evidence in existence as of that time to support representations made by CIGC on its website about its Laparoscopic Assisted Abdominal Myomectomy ("LAAM") procedure; (2) information regarding CIGC's "travel program", which was described in Defendants' website; (3) the schedule of Paul MacKoul, M.D. for October 22, 2015; (4) advertisements published by the CIGC for the LAAM procedure for the five years preceding October 22, 2015; and (5) the nature and amount of any unintended injuries to other organs during performance of the LAAM procedure by any physician employed by CIGC.

3.      Defendant CIGC broadly argues that these general topics are irrelevant and immaterial to Plaintiff's claims in this case because, as Defendants frame the case, Plaintiff's standard of care expert—Dr. Steven McCarus—was only critical of Dr. Danilyants' performance of the surgery and not of the advertising on the website or representations made by Dr. Danilyants or by CIGC on its website.  Defendant CIGC is wrong on the facts and the law.

4.      As described more fully below, Sarah Sandoval traveled from Scottsdale, Arizona to Rockville, Maryland in order to have a myomectomy procedure performed by Dr. Danilyants and the CIGC.  Ms. Sandoval made that decision based on representations made to her by CIGC, through its website, and by Dr. Danilyants about the uniqueness,

2

safety, and minimally invasive nature of a procedure that the CIGC has named the LAAM procedure. What Ms. Sandoval was told by CIGC and Dr. Danilyants about the LAAM procedure, including a description of the procedure and how it differs from alternative procedures, the risks of the LAAM, the alternatives to the LAAM, and the relative safety of the LAAM procedure versus its alternatives is unequivocally relevant to Ms. Sandoval's informed consent claim. Plaintiff is entitled to explore the factual basis of CIGC's and Dr. Danilyants' representations about the LAAM procedure, which Plaintiff believes have no factual or scientific basis—it's just marketing dressed up like scientific and medical fact. For the same reason, Plaintiff is entitled to explore the truthfulness of Defendants' representations about CIGC's travel program as marketed and advertised by CIGC, which made it appear that CIGC was such a leader in myomectomy surgery throughout the nation and the world that people were traveling from all over the country to undergo the LAAM procedure. The existence and vitality of the travel program was part of the information relied on by Ms. Sandoval in choosing to travel across the country to undergo the LAAM procedure and was material information that was important not only to Sarah Sandoval but to the "reasonable patient" in considering whether to travel across the country to undergo an allegedly unique, safe and minimally invasive procedure. The content and data supporting CIGC's advertisements and the amount and nature of adverse events suffered by CIGC's patients also goes to the issue of how safe the LAAM procedure was as compared to other myomectomy procedures. Finally, the schedule of Dr. MacKoul is relevant because one of the criticisms of Plaintiff's standard of care expert is that Dr. Danilyants needed to have immediately available to her and to participate in Ms. Sandoval's surgery a surgeon who was

experienced with working with and dissecting bowel because of the dense adhesions of Ms. Sandoval's uterus to the bowel that were evident on MRI and were also obvious during the surgery.  Dr. Danilyants' response is that she always had Dr. MacKoul available.   If Dr. MacKoul was at the surgery center on the day that Ms. Sandoval was having surgery, he might have been available to Dr. Danilyants, as she testified.  If he was in another state or in another location, he would not have been available to her.  For all of these reasons, the Defendants' Motion for Protective Order should be denied and Defendant CIGC and Dr. Danilyants should be ordered to immediately produce the corporate designee for the areas of testimony designated in the corporate designee deposition notice and with the documents requested in hand.

5.      The Notice of De Been Esse Deposition for the CIGC Corporate Designee/Designees was originally filed on April 20, 2018 with a scheduled deposition date of May 21, 2018.  See Exhibit 1.   Although Armstrong, Donohue, Ceppos and Vaughn had entered their appearance and answered Plaintiff's Complaint on behalf of CIGC, after defense counsel received the corporate designee deposition notice, they told Plaintiff's counsel that they had to get new representation for CIGC and that the law firm of Wharton Levin would likely be entering their appearance.  At the request of Wharton Levin, the originally scheduled corporate designee date of May 21 was rescheduled to July 2, 2018 and a new Deposition Notice was issued.  See Exhibit 2.  At no time prior to a few days before the filing of CIGC's Motion for Protective Order did anyone on behalf of CIGC indicate that they would be objecting to the topics of the Motion or filing a Motion for Protective Order, despite having had notice of the corporate designee deposition since April 20, 2018.

4

6.     Plaintiff served Defendant CIGC with a Request for Production of Documents on April 20, 2018. CIGC had thirty (30) days in which to respond to the document production. CIGC failed to do so. It was not until the filing of the Motion for Protective Order on June 25, 2018 that CIGC for the first time objected to any of the documents requested or sought protection from this Court.

7.     Although there is no set period for filing a Motion for Protective Order, normally the Motion must be filed before the discovery is to occur unless there is no opportunity to do so. See Mims v. Central Manufacturers Mutual Insurance Co., 178 F. 2d 56, 59 (5th Cir. 1949); Drexel Heritage Furnishings, Inc. v. Furniture U.S.A., Inc., 200 F.R.D. 255. 260 (M.D.N.C. 2001). Here, there was ample time to file a Motion for Protective Order before 30 days had expired. CIGC took no action and, to date, has still not responded to Plaintiff's document request. Accordingly, CIGC's Motion for Protective Order as to the Request for Production of Documents is untimely and should be denied on that basis alone.

8.     Further, Defendants' motion for protective order should be denied in whole because the information sought in the CIGC corporate designee deposition notice, and the documents sought to be produced pursuant to the deposition notice are directly relevant to Plaintiff's informed consent count.  The Plaintiff seeks information relating to the factual, medical or scientific basis of representations made by CIGC on its website and by Dr. Danilyants, over the phone and in person, to Ms. Sandoval.

9.     Maryland recognized a claim for failure to obtain informed consent as early as 1972 in the seminal case of Sard v. Hardy, 281 Md. 432, 379 A. 2d 1014 (1977), in which the Court held that the duty of informed consent imposed on a physician "the

duty to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." Id. at 439-440, 379 A.2d at 1020. The duty to disclose was defined broadly to require a physician to "reveal to his patient the nature of the ailment, the nature of the proposed treatment, the probability of success of the contemplated therapy and its alternatives and the risk of unfortunate consequences associated with such treatment." Id. The doctrine of informed consent applies to all plans of care recommended by a physician to a patient, including plans of care that are not physically invasive in nature. McQuitty v. Spangler, 410 Md. 1, 20-22, 976 A.2d 1020, 1031-1032 (2008). The McQuitty court explained that the "gravamen of an informed consent claim…is a healthcare provider's duty to communicate information to enable a patient to make an intelligent and informed choice, after full and frank disclosure of material risk information and the benefit of data regarding a proposed course of medical treatment." Id. at 22, 976 A.2d at 1032. Thus, under Maryland law, in order to properly obtain a patient's informed consent, the physician must describe the procedure that is planned, the risk and benefits to the planned procedure, the alternatives to the procedure, and the risks and benefits to the alternatives to the procedure. It is axiomatic that the representations made by CIGC and Dr. Danilyants to Sarah Sandoval about the LAAM procedure, its safety, and its relative safety compared to alternative myomectomy procedures such as a robotic procedure, an open procedure, and a laparoscopic myomectomy, are completely relevant and material to Plaintiff's informed consent claim.

6

10.     Further, in <u>Sard,</u> the Court of Appeals made clear that the lens through which a jury is to determine the reasonableness of the disclosure would be measured was a layperson's standard of reasonableness – not a professional standard.  <u>Sard</u>, 281 Md. at 442, 379 A.2d at 1021.  The Court explained that "the appropriate test is not what the physician in the exercise of his medical judgment thinks a patient should know before acquiescing in a proposed course of treatment; rather the focus is on what data the patient requires in order to make an intelligent decision."  <u>Id.</u>  The Court of Appeals summarized its position, stating "[W]hether a physician has fulfilled his duty to disclose, then, is to be determined by reference to a general standard of reasonable conduct and is not measured by a professional standard of care."  <u>Id.</u> at 444, 379 A.2d at 1022.

11.     The Maryland courts have resisted declaring a bright line test for determining the scope of disclosure required by a physician to his patient.  <u>Sard</u>, 281 Md. at 444, 379 A.2d at 1022; <u>Goldberg v. Boone</u>, 396 Md. 94, 123, 912 A. 2d 698, 714 (2006).  The measure of disclosure is dependent on each patient's need.  <u>Goldberg</u>, 396 Md. at 123, 912 A.2d at 714.  While "risks, benefits, collateral effects, and alternatives normally must be disclosed routinely," the courts have recognized that "other considerations…may also need to be disclosed and resolved."  <u>Id.</u> at 125, 912 A.2d at 716, quoting from <u>Dingle v. Belin</u>, 358 Md. 354, 370, 749 A.2d 157, 165 (2000).  In <u>Goldberg</u>, the need for disclosure expanded to encompass the need for a surgeon to disclose to the patient his lack of experience and that there were other, more experienced surgeons available.  <u>Goldberg</u>, 396 Md. at 129-130, 912 A.2d at 718.

12.     A review of the Maryland informed consent law makes clear that what Sarah Sandoval learned from CIGC's website and Dr. Danilyants is critical, relevant

7

information to the informed consent claim. Certainly, the Defendants had a duty to disclose the proposed treatment and the alternatives to that treatment, and the relative risks of each proposed or alternate treatment. Thus, Defendants' representations, and the truthfulness of those representations, about the LAAM procedure, its safety and efficacy as compared to other alternatives, the CIGC travel program, and whether Dr. Danilyants and her colleagues at CIGC had encountered adverse events in the past through use of the LAAM procedure are all fair game in discovery in this case.

13.     Sarah Sandoval lives in Scottsdale, Arizona and did so at the time of the events at issue in this case. Ms. Sandoval was lured to Rockville, Maryland for a myomectomy surgery based on representations made by CIGC and Dr. Danilyants on their Internet pages and based on representations made by Dr. Danilyants during a phone call regarding whether or not Ms. Sandoval was an appropriate candidate for the LAAM procedure, which Defendants claimed was a unique procedure for removal of fibroids that was safer and better than robotic surgery, open surgery or a laparoscopic myomectomy.

14.     Sarah Sandoval conscientiously tried to be an informed consumer of medical care when she was making her decisions with regard to what surgery to undergo for removal of her large uterine fibroid and who to choose to perform that procedure. When Ms. Sandoval first learned that she had a large fibroid, she sought the advice of a gynecologist in Scottsdale, Arizona—Dr. Stadnick. Ms. Sandoval, being a young attractive woman, was interested in as minimally invasive a procedure as possible that would preserve her fertility and her ability to have children. In other words, she did not want to undergo a hysterectomy.

8

15.     Dr. Stadnick told Ms. Sandoval that she had a large fibroid on her uterus that was so large that it was pushing both ovaries onto one side of her abdomen and tipping her uterus.  Sandoval Deposition at 90-91, attached in full as Exhibit 3.  Dr. Stadnick told Ms. Sandoval that her options for treatment included drug therapy to see if the fibroid would shrink but that she recommended, given the size of the fibroid, surgical removal.  Id. at 92.  Dr. Stadnick told Ms. Sandoval that they could do robotic surgery and that they would start with robotic but, given the size of the fibroid, they might well have to convert to open depending on what they found when they got in there.  Id. at 92-93.  Ms. Sandoval understood that the robotic surgery involved 4 to 5 incisions, which allowed for a shorter healing time and that the fibroid would be removed without having to perform an open surgery.  Id. at 93.  Dr. Stadnick also told Ms. Sandoval that she was relatively inexperienced with the robotic surgery, having not done those surgeries as part of her primary area and that Dr. Stadnick would perform the surgery with her partner who was more experienced.  Id. at 94-95.  That inexperience made Ms. Sandoval nervous and she began to search on the web for other physicians who might be in the area that could do the surgery.

16.     In deposition, Ms. Sandoval fully described the search that she undertook to find a provider and a procedure that would be less invasive with a surgeon who had more experience.  Specifically, Ms. Sandoval performed Internet research by searching the terms "myomectomies", "minimally invasive myomectomies", and "top doctors for myomectomies".  With every web search that she performed, the CIGC name was at the top of the list.  Id. at 101-102.  Thus, from the internet representations, it appeared to Ms. Sandoval that the CIGC was a big facility for myomectomies and the representations

9

made by CIGC made it clear that the way that CIGC physicians performed myomectomies was unique and safer than all other types of procedures.

17.      Ms. Sandoval also had a telephone consultation with Dr. Danilyants regarding whether she was an appropriate candidate for the LAAM procedure and to get the details on the LAAM procedure.  This telephone conversation was the only discussion that Ms. Sandoval had with anyone at CIGC prior to traveling from Arizona to Rockville, Maryland to have surgery.  After reviewing Ms. Sandoval's MRI of her pelvis and her medical records, Dr. Danilyants told Ms. Sandoval that she thought Ms. Sandoval was a good candidate for the LAAM procedure.  Id. at 103.  Ms. Sandoval confirmed that she wanted to preserve her fertility and her ability to have children.  Id.  Ms. Sandoval asked Dr. Danilyants about what other physicians had told her in terms of options, including robotic surgery and a chance that there might be an open procedure.  Id. at 103-104.  Dr. Danilyants told Ms. Sandoval that "with our surgery, the size of the fibroid really doesn't matter, that you still look like you would be a good candidate for the LAAM."  Id.

18.      Ms. Sandoval asked Dr. Danilyants about what sort of complications have occurred or what risks occur with the kind of surgeries they do at CIGC.  Dr. Danilyants described a risk of infection, a risk of blood loss, and a risk of damage to other organs but that that risk was extremely low.  Dr. Danilyants told her that they could schedule the surgery within 2 weeks if she wanted to go forward.  Id. at 104.

19.      Dr. Danilyants touted the safety and success of the LAAM procedure over other procedures.  Dr. Danilyants claimed that they (CIGC) had a high success rate for even complicated situations where the fibroids may be very large or there may be several fibroids, that the recovery time was shorter compared to robotic or open surgeries and

that the risks were lower with the LAAM procedure compared to other robotic or open surgeries. Id. at 105-106. In terms of what Ms. Sandoval's understanding was with regard to why the LAAM was less invasive than a robotic surgery, Ms. Sandoval stated that she had been told that the LAAM procedure only used 2 incisions while the robotic surgery used 4 to 5 incisions. Further, in the robotic surgery, they ground up the fibroid which was less safe than the way they remove the fibroid in the LAAM procedure. Id. at 106-107. Dr. Danilyants told Ms. Sandoval that CIGC could remove large fibroids without difficulty using the LAAM procedure.

20.     Importantly, Ms. Sandoval also believed that the LAAM procedure was not an open procedure and she in fact had discussions with Dr. Danilyants about that fact. It was Ms. Sandoval's understanding, based on what Dr. Danilyants told her as well as looking at the website, that with the LAAM procedure, they did not typically have to convert to open surgery, where as in the robotic surgery, they would have to sometimes convert to open. Id. at 107-108. Ms. Sandoval testified that Dr. Danilyants specifically talked about the possibility of having to convert to open, stating:

> I did ask her. I said, so they told me at this other gynecologist that they were going to try robotic, but that there was a chance they might have to convert to open.
> She said, based off of your imaging, I don't see a reason why you would need to convert to open.

Id. at 108.

21.     Ms. Sandoval also testified that based on the CIGC website and what Dr. Danilyants told her, she understood that the risks of myomectomy surgery were lower with the LAAM procedure. With robotic, she understood that there were more incisions

and that they were grinding things up and that there was more risk for infections, a higher risk for blood loss, a higher risk for having to convert to any open surgery and a longer recovery time.  With the LAAM procedure, she understood that there were still risks for infection, blood loss and damage to other organs but that the risk rate was extremely low. Id. at 109.

22.     Ms. Sandoval also made clear that in making her decision to travel to Rockville, Maryland for the LAAM procedure, she relied on information published by CIGC on its website about how the LAAM procedure compared to robotic surgery.  Id. at 112.

23.     After the phone call with Dr. Danilyants, there were no other discussions between Ms. Sandoval and Dr. Danilyants or CIGC about the common complications and risks prior to surgery.  Id. at 117-118.

24.     On the day of surgery, Ms. Sandoval asked Dr. Danilyants other questions with regard to the LAAM procedure, which included whether, if there were additional fibroids or anything that they found, would she remove those additional fibroids at the same time and whether they would do anything to correct the position of her uterus.  Dr. Danilyants said that they would remove all fibroids that they found and that they would allow the uterus to simply resolve its positioning on its own after the fibroid was removed.  Id. at 116-117.

25.     The CIGC website from 2017 contains numerous representations to the effect that the LAAM procedure is much better, safer, more effective, and less invasive than an open procedure, a robotic procedure, a traditional laparoscopic myomectomy, or

any other procedure. See, e.g., representations made in Exhibits 4 through 8, highlighted for the Court's benefit.

26.     In deposition, Dr. Danilyants agreed to the alleged "truth" of the representations made by herself and CIGC on the web. See, e.g., pp. 16-18, 21-23, 48-49, 57, 63-70, 76-80 of Dr. Danilyants' deposition testimony, pertinent portions of which are attached hereto as Exhibit 9.

27.     The representations contained on CIGC's website as of 2017 certainly substantiate the information that Ms. Sandoval testified she saw on the internet when she was searching for myomectomy surgeons. Plaintiff has every reason to believe that the representations contained in CIGC's website in the summer and fall of 2015 were substantially the same, but Plaintiff requires discovery on that point – which was a large part of the focus of the corporate designee deposition. Further, the representations clearly state as fact that the LAAM procedure is safer, less invasive and has a shorter recovery period than any other option for surgical removal of fibroids. Plaintiff is entitled to discover the medical or scientific basis (if one exists) for those representations.

28.     Nothing could be more relevant or material to Plaintiff's informed consent claim as what Ms. Sandoval was told and what she relied on in making her decision to under a LAAM procedure by Defendants. The truthfulness of the representations made are at the heart of the informed consent case and the corporate designee deposition of CIGC should be allowed to go forward without limitation.

29.     Defendants also object to the part of the corporate designee deposition notice in which Plaintiff seeks information with regard to CIGC's travel program. Exhibits 4 through 8 make clear that CIGC represented its travel program as a safe and

effective way for women out of Maryland to undergo the LAAM in Maryland. The representations on the website about the travel program and how safe it was for women to travel across the country to get this procedure served as an inducement to Ms. Sandoval. Contrary to the representations made by CIGC, which were designed to induce and lure women such as Ms. Sandoval to travel from long distances to Maryland with the belief that CIGC was well set up to support and sustain, in a safe manner, women traveling long distances for procedures, Plaintiff's standard of care expert, Steven McCarus, M.D was of the opinion that it was a breach of the standard of care for Ms. Sandoval to have undergone surgery in a surgery center, to not be hospitalized overnight, and to be released, by a nurse, without Dr. Danilyants ever laying eyes on Ms. Sandoval again, on post-op day number 1, particularly in light of the fact that Ms. Sandoval's surgery was complicated by excessive blood loss. See McCarus Deposition at pp. 124 – 126, 136-137, pertinent portions of which are attached hereto as Exhibit 10. Information about the travel program is relevant and material and Plaintiff's discovery of that information should be allowed.

30.    CIGC also argues that it should be protected from disclosing the nature and amount of unintended injuries to other organs occurring during the performance of the LAAM procedure by any physician employed by the CIGC. Obviously the overall "safety" of the LAAM procedure touted by the Defendants in representations made to the Plaintiff is impacted by the number of unintended injuries of organs. This discovery should be allowed.

31.     Defendants also seek protection from disclosing the number of surgeries performed by Dr. Danilyants. Obviously, this information goes directly to Dr. Danilyants' level of experience and should be allowed.

32.     Defendants also seek protection from disclosing the number of medical providers who referred patients to the CIGC for myomectomy surgery in the calendar year 2015. This topic goes to the heart of one of the representations made by CIGC on its website, and should be allowed.

33.     Finally, Defendant CIGC argues that Plaintiff should not be allowed to get Dr. MacKoul's schedule for October 22, 2015—the day of Sarah Sandoval's surgery by Dr. Danilyants. Dr. McCarus, Plaintiff's standard of care expert, testified that, in his opinion, the standard of care required Dr. Danilyants to approach Ms. Sandoval's surgery with plans to be ready to have a consultation with a general surgeon, colorectal surgeon, or other surgeon capable of dissecting massive adhesions around the bowel safely. See McCarus Deposition at 100-102, attached hereto as Exhibit 10. Dr. Danilyants testified that she had Dr. MacKoul available to consult, if necessary, although she had never actually consulted with Dr. MacKoul intraoperatively. See Danilyants Deposition at pp. 45-46 attached hereto as Exhibit 9.

34.     Defendants are clearly going to argue in this case that by having Dr. MacKoul available, Dr. Danilyants met the standard of care as defined by Dr. McCarus (although presumably Defendants will also argue that Dr. MacKoul's availability was not necessary.) The most efficient determination of Dr. MacKoul's availability is the production of Dr. MacKoul's schedule for October 22, 2015. Dr. MacKoul was either at the surgery center, at CIGC offices, somewhere else entirely, or potentially on vacation,

out of state or out of the country. Defendant CIGC argues that this information can be obtained simply through the testimony of the corporate designee who can testify as to Dr. MacKoul's whereabouts on October 22, 2015. While Plaintiff's counsel certainly intends to ask the corporate designee that question, Plaintiff is also entitled to documentary proof of whatever that testimony is. Defendants do not get to choose the type of discovery the Plaintiff gets—if Plaintiff has properly sought appropriate discovery of this fact, then it should be turned over. Obviously, the schedule of Dr. MacKoul, to the extent that it discloses patient identifying information, can be redacted so as to protect patient confidentiality.

35.     Defendants also argue that Plaintiff could get the same information about Dr. MacKoul's availability through a deposition of Dr. MacKoul. The idea that it is less invasive to ask for the deposition of a medical doctor rather than get the doctor's schedule for October 22, 2015 from the corporation that schedules Dr. MacKoul and maintains his schedule stretches credibility.

36.     For all of the reasons stated above, and any reasons advanced at the hearing of this matter, Defendants' Motion for Protective Order should be denied and Defendant CIGC should be ordered to promptly put forward a corporate designee or designees ready to answer areas of inquiry and produce the documents requested at a time mutually to Plaintiff's counsel, defense counsel and the witness but in no event later than

3 weeks from the date of denial of the Motion for Protective Order.


                                        /s/ Alison D. Kohler
                                        ALISON D. KOHLER (Bar #01277)
                                        Dugan, Babij, Tolley & Kohler, LLC
                                        1966 Greenspring Drive, Suite 500
                                        Timonium, Maryland 21093
                                        akohler@medicalneg.com
                                        (410) 308-1600
                                        *Attorneys for Plaintiff*


## REQUEST FOR HEARING

Plaintiff, Sarah Sandoval, respectfully requests a hearing on the Motion for

Protective Order and Motion to Stay filed by Defendant The Center for Innovative Gyn

Care, P.C. and Plaintiff's Opposition thereto.


                                        /s/ Alison D. Kohler
                                        ALISON D. KOHLER (Bar #01277)
                                        Dugan, Babij, Tolley & Kohler, LLC
                                        1966 Greenspring Drive, Suite 500
                                        Timonium, Maryland 21093
                                        akohler@medicalneg.com
                                        (410) 308-1600
                                        *Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| SARAH SANDOVAL | * |
|     Plaintiff | * |
| v. | * Civil Action No.: 1:17-cv-01599 PJM |
| THE CENTER FOR INNOVATIVE GYN CARE, PC, et al. | * |
| | * |
|     Defendants | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of July 2018 that a copy of Plaintiff's Opposition to Motion for Protective Order and Motion to Stay filed by Defendant The Center for Innovative Gyn Care, P.C., Request for Hearing and Proposed Order were delivered by first class mail and electronically to:

Benjamin Vaughan, Esquire
Susan Boyce, Esquire
Armstrong, Donohue, Ceppos, Vaughan & Rhoades, Chtd.
204 Monroe Street, Suite 101
Rockville, Maryland 20850

Michael K. Wiggins, Esquire
J. Kristen Wiggins, Esq.
Wharton Levin Ehrmantraut & Klein
104 West Street
P.O. Box 551
Annapolis, Maryland 21404-0551

                                   /s/ Alison D. Kohler
                                ALISON D. KOHLER (Bar #01277)
                                Dugan, Babij, Tolley & Kohler, LLC
                                1966 Greenspring Drive, Suite 500
                                Timonium, Maryland 21093
                                akohler@medicalneg.com
                                (410) 308-1600
                                *Attorneys for Plaintiff*