IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


| | | |
|---|---|---|
| **SARAH SANDOVAL** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. PJM 17-cv-1599 |
| | * | |
| **NATALYA DANILYANTS, M.D.,** *et al.,* | * | |
| | * | |
| Defendants. | * | |


## MEMORANDUM OPINION

Sarah Sandoval sued Natalya Danilyants, M.D. and Danilyants' employer The Center for Innovative Gyn Care, PC (CIGC) for medical malpractice arising from myomectomy surgery performed by Danilyants in 2015. Following the surgery, Sandoval was found to have two perforations of the bowel, which required additional corrective surgeries.

The case went to trial beginning July 13, 2021. Sandoval's claims proceeded in two counts – one for negligence (Count I) and the other for failure to obtain informed consent (Count II). As with any medical malpractice case, Sandoval was required to support her allegations with expert testimony to the effect that, to a reasonable degree of medical probability, Danilyants breached the applicable standard of care, and that, to a reasonable degree of medical certainty the negligence caused Sandoval's injuries. At trial, Sandoval offered the testimony of two physicians: Michael Hovey, M.D., her treating surgeon following the challenged surgery by Danilyants, and Steven McCarus, M.D. who offered expert opinion testimony on causation. At the end of a nine-day trial, the jury returned a verdict in favor of Sandoval on her negligence claim, but in favor of Defendants on the informed consent claim, and awarded Sandoval $1.5 million on Count I.

Following trial, Defendants filed a Renewed Motion for Judgment as a Matter of Law, ECF No. 111, as well a Motion for Remittitur/Motion to Alter or Amend the Judgment Pursuant to the Maryland Healthcare Malpractice Claims Act, ECF No. 112. In the Motions, they argue that the jury verdict must be reversed because, say Defendants, Sandoval's expert testimony failed to establish that Defendants' alleged negligence *caused* her injuries. Alternatively, if the verdict is upheld, Defendants seek a reduction in the amount of the damage award in order to comply with Maryland's statutory cap on noneconomic damages as well as to eliminate costs they contend were not occasioned by Danilyants' acts. Sandoval has responded, urging the Court not to disturb the verdict, agreeing, however, to some but not all, of the reductions in damages Defendants seek.

For the reasons that follow, the Court **DENIES** Defendants' Motion for Judgment as a Matter of Law, and **GRANTS IN PART** and **DENIES IN PART** their Motion for Remittitur.

## I.      Factual Background

On August 25, 2015, Sandoval underwent an MRI that showed a mass in her pelvis consistent with a subserosal fibroid on her uterus. The fibroid was over fifteen centimeters in diameter, distorting Sandoval's anatomy, resulting, for instance, in both ovaries being located on the same side of her body. When her doctor recommended surgery, she elected to pursue a laparoscopic assisted abdominal myomectomy ("LAAM") at the CIGC in Maryland.[1]

After pursuing pre-surgery lab work, Sandoval underwent the surgery performed by Danilyants at CIGC on October 22, 2015. During the procedure, it was revealed that Sandoval had

---

[1] A LAAM, as described by Dr. McCarus, is "a combination approach" to a myomectomy, where the surgeon goes "in with the camera through the belly button. You add another incision, you assess the situation. And then that lower incision, you actually remove that instrument and make a cut to get access into the belly." Trial Tr. vol. 3, 33. A fibroid, when removed laparoscopically, can be removed through an incision at the belly button, suprapubically in the midline, or through the vagina. *Id*. at 31.

multiple fibroids, the largest of which was attached to the bowel. Her right ovary was also stuck to the bowel and the uterus. During the removal of the fibroids, there was significant loss of blood.

Three days after the surgery, Sandoval flew back to her home in Scottsdale Arizona. In the two weeks following the surgery, her pain initially improved, but then began to worsen. On November 5, 2015, Sandoval called CIGC and reported pain for which she was prescribed further pain medication. That same night Sandoval went to the emergency room at a hospital in Scottsdale where she reported fever, nausea, and pain. A CT scan showed evidence of infection. Sandoval therefore underwent a second surgery, this one performed by Dr. Hovey, which revealed a perforation of the cecum.[2] Though initially Sandoval's condition began to improve, within a few days another CT scan showed further infection. On November 12, 2015, she underwent surgery again, during which the surgeon found a rectal perforation. Both perforations were believed to have been caused by the surgery performed by Danilyants. After recuperating for several weeks with an ileostomy,[3] Sandoval was discharged from the hospital. In a subsequent surgery, the ileostomy was later reversed.

In this suit, Sandoval alleges that she continues to have pain in her abdomen and pelvis, and that she has been told that she likely suffered damage to her reproductive system that will make it impossible for her to become pregnant.

## II.    Procedural History

---

[2] The "cecum" is "[t]he cul-de-sac, about 6 cm in depth, lying below the terminal ileum, forming the first part of the large intestine." *Cecum*, Stedman's Medical Dictionary, 154160 (2014).

[3] An "ileostomy" is the "[e]stablishment of a fistula through which the ileum discharges directly to the outside of the body." *Ileostomy,* Stedman's Medical Dictionary, 434630 (2014).

On May 24, 2017, Sandoval filed a Statement of Claim with the Health Care Alternative Dispute Resolution Office of Maryland, naming Danilyants and CIGC as Defendants. On or about May 25, 2017, the Health Care Alternative Dispute Resolution Office issued an order transferring Sandoval's claim to this Court. Sandoval filed her Complaint here on June 12, 2017.

On March 18, 2019, the parties jointly informed the Court that they did not intend to file any dispositive motions and requested that the case be scheduled for trial. Following Covid-related delays, an in-person jury trial was held over the course of nine days, beginning on July 13, 2021. At the end of Sandoval's case on July 20, 2021, and again at the close of all evidence on July 22, 2021, Defendants moved for judgment as a matter of law. Trial Tr. vol. 5, 4-8; 17-21; Trial Tr. vol. 7, 3-4. The Court reserved ruling on the motions, taking them under advisement.

The jury returned a verdict in favor of Sandoval, *see* ECF No. 106, and answered special interrogatories as follows:

1.  Do you find that Plaintiff has proven that Defendant, Natalya Danilyants, M.D., breached the standard of care in her treatment of Sarah Sandoval on October 22, 2015?
    a.  Yes

2.  Do you find that Plaintiff has proven that the breach of the standard of care by Defendants, Natalya Danilyants, M.D., was a proximate cause of injury to Sarah Sandoval?
    a.  Yes

3.  Do you find Plaintiff has proven that Defendant, Natalya Danilyants, M.D., failed to obtain an appropriate informed consent from Sarah Sandoval for the October 22, 2015 surgery?
    a.  No

The jury awarded Sandoval $529,571.04 for past medical expenses; $41,500.00 for past lost wages, and $928,928.96 as non-economic damages, totaling $1.5 million, which would carry

post-judgment interest at the federal statutory rate. The Court also awarded Sandoval costs. ECF Nos. 106, 109.

After the Court entered judgment on the jury verdict, Defendants filed a Renewed Motion for Judgment as a Matter of Law, ECF No. 111, and Motion for Remittitur/Motion to Alter or Amend the Judgment, ECF No. 112. Sandoval responded and Defendants replied. The matters are now before the Court for resolution.

### III. Discussion

#### a.   Motion for Judgment as a Matter of Law

A renewed motion for judgment as a matter of law under Rule 50(b) "assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 155 (4th Cir. 2012), *as amended* (May 9, 2012). In a medical malpractice case, pursuant to Fed. R. Civ. P. 50(b) "the court may be called upon . . . to evaluate the sufficiency of the expert's testimony . . . after the jury has reached its verdict." *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 468 (D. Md. 2000), *aff'd sub nom. Berger v. Ford Motor Co.*, 95 F. App'x 520 (4th Cir. 2004). "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting Fed. R. Civ. P. 50(a)). The court views the evidence in the light most favorable to the non-movant, *Gregg v. Ham*, 678 F.3d 333, 341 (4th Cir. 2012), and asks whether there is "substantial evidence in the record to support the jury's findings." *See Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001) (citation omitted).

To prevail in a medical malpractice action, Maryland law[4] requires a plaintiff to establish "(1) the applicable standard of care, (2) that the defendants breached this standard, and (3) that her injuries were caused by the defendants' breach." *Simmons v. O'Malley*, 85 F. App'x 322, 2 (4th Cir. 2004), *citing Weimer v. Hetrick*, 309 Md. 536, 547, 525 A.2d 643, 648–49 (1987). Juries are not permitted to simply infer medical negligence in the absence of expert testimony because the determination of issues relating to breaches of standards of care and medical causation are considered to be "beyond the ken of the average layperson." *Am. Radiology Servs., LLC v. Reiss*, 470 Md. 555, 580, 236 A.3d 518, 532 (2020). As such, "expert testimony is required to establish negligence and causation." *Simmons*, 85 F. App'x 322, *citing Meda v. Brown*, 318 Md. 418, 428, 569 A.2d 202, 207 (1990). *See also Rodriguez v. Clarke*, 400 Md. 39, 71, 926 A.2d 736 (2007). Moreover, an expert's testimony as to breach of the standard of care must be expressed to a "reasonable degree of medical probability" and causation to a reasonable degree of medical certainty to ensure that the expert's opinion is more than mere speculation or conjecture. *American Radiology Services, LLC*, 470 Md. at 581 (*citing Kearney v. Berger*, 416 Md. 628, 651–52, 7 A.3d 593 (2010)).

In the Fourth Circuit, "questions regarding the sufficiency of expert evidence offered to meet an essential element of a claimant's cause of action" are governed by federal law. *See Samuel*, 112 F. Supp. 2d at 466, *citing Owens by Owens v. Bourns, Inc.*, 766 F.2d 145, 149 (4th Cir. 1985) ("[e]ven under diversity jurisdiction the sufficiency of the evidence to create a jury question is a matter governed by federal law."). *See also Fitzgerald*, 679 F.2d at 346 (noting that substantive elements of a diversity claim are determined by state law, but whether there is sufficient evidence

---

[4] Substantive elements of a diversity claim are determined by state law. *See Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982).

to create a jury issue on essential elements of plaintiff's claim is governed by federal law). There are "two distinct requirements for a medical expert's causation testimony" "(1) the likelihood that defendant's conduct caused plaintiff's injury (which must be more probable than not), and (2) whether the expert expressed this 'more likely than not' opinion to a reasonable degree of medical certainty." *Riggins v. SSC Yanceyville Operating Co., LLC*, 800 F. App'x 151, 156–157 (4th Cir. 2020), *citing Fitzgerald*, 679 F.2d at 348–50. "Testimony that the alleged negligence was the 'more probably than not' cause of plaintiff's injury alone is not enough. The expert's testimony must be stated 'with sufficient certainty.'" *Riggins*, 800 F. App'x at 158 *citing Fitzgerald*, 679 F.2d at 350–51.

Defendants argue that judgment in their favor should be entered as a matter of law because at trial, Sandoval, in their view, failed to introduce legally sufficient evidence from which a reasonable jury could find in her favor on the issue of causation. Defendants contend that Dr. McCarus did not opine that any departure from standard of care proximately caused Sandoval's injuries. Their argument hinges on Defendants' view that Dr. McCarus did not opine that the injuries would not have occurred if Danilyants had taken the actions Sandoval alleged were required by the standard of care. Moreover, Defendants argue that Dr. McCarus did not testify with the requisite degree of medical certainty. Sandoval counters that there was clear testimony from Dr. McCarus that he believed Danilyants' negligence caused Sandoval's injuries, and that his testimony was stated with sufficient medical certainty.

To support the jury verdict, Dr. McCarus' testimony needed to state that "with a reasonable degree of medical certainty, that the victim probably would have avoided the harm or achieved a better result but for the defendant's negligence." *Goldberg v. Boone*, 396 Md. 94, 128, 912 A.2d 698, 717 (2006) (quotation omitted); *Barton v. Advanced Radiology P.A.*, 248 Md. App. 512, 533,

242 A.3d 240, 253 (2020), *cert. granted,* 472 Md. 311, 245 A.3d 991 (2021), and *cert. dismissed as improvidently granted,* 474 Md. 122, 252 A.3d 965 (2021) ("To prove causation, the [plaintiff] had to establish that but for the negligence of the defendant[s], the injury would not have occurred"). "If, with that evidence, a reasonable jury could return a verdict in favor of [the plaintiff], the court must defer to the judgment of the jury, even if the court's judgment on the evidence differs." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). *See, e.g., Daniel v. Jones*, 39 F. Supp. 2d 635, 643–47 (E.D. Va. 1999), *aff'd sub nom. Daniel v. Pearce*, 213 F.3d 630 (4th Cir. 2000) (denying defendants' Rule 50 motion because there was evidence from the plaintiff's expert which established a nexus between plaintiff's injuries and defendants' action, and therefore, there was evidence upon which a jury could reasonably return a verdict for plaintiff); *Knussman v. State*, 65 F. Supp. 2d 353, 356 (D. Md. 1999), *aff'd in part, vacated in part, remanded,* 272 F.3d 625 (4th Cir. 2001) (citations omitted).

The Court believes there was sufficient testimony for the jury to conclude that this test was met.

At trial, Dr. McCarus opined that there were actually two breaches of the standard of care in performing the myomectomy: (1) Danilyants' failure to extend the myomectomy incision; and (2) Danilyants' failure to call for an intraoperative general surgery consult. He explained that "when you have an anatomically distorted pelvis, such as this case, you have to have good exposure. You have to be able to see. You have to open that incision up, manage the bowel properly, manage the fibroid properly." Trial Tr. vol 3, 68. "It's almost like you don't work on a car engine through the tail pipe. You have to open the hood to see all the lay of the engine and all the different parts to be able to . . . fix it correctly and safely." *Id.* at 82. Thus, when asked "what, if any approach would have met the standard of care in your opinion?" Dr. McCarus summed up:

Well, there's a couple things. Number one, she had permission, Dr. Danilyants had the permission to go ahead and open the belly… So that is one thing that could have happened… [S]he could have called in someone to help her, to check the rectum, to check the bowel, to take the adhesions down, to recreate normal anatomy. And that was her job to do that and that's what she promised the patient to do, but for some reason she just didn't do that. So I think that's a breach in the standard of care.

*Id.* at 68–69.

This testimony came in the context of Dr. McCarus explaining several important points to the jury. He explained that Sandoval's largest fibroid was quite large (measuring 15 centimeters broad and weighing 1,230 grams); that it was stuck to a low, difficult to access part of the bowel; that Sandoval had numerous such adhesions (fibroid to uterus, fibroid to bowel, ovary to bowel) that would require severing; that while gynecological surgeons are able to "take down" some level of bowel adhesions, significant work on the bowel is outside their "scope"; that there was significant bleeding during the operation which can inhibit a surgeon's visibility; and that an open surgery, compared to laparoscopic, better permits a surgeon to feel, "manage," and be precise.

Defendants do not necessarily contest that Sandoval offered sufficient evidence that these standards of care were breached: They effectively concede that Danilyants did not extend the incision beyond an initial two inches, and she did not call in a "consult" to assist with the bowel. The crux of their argument is that Sandoval, through the expert testimony, did not link these breaches to her injuries.

But reviewing the record, it is apparent that Dr. McCarus did opine that the breaches of this "blended" standard of care caused the injuries: "I think the injury wouldn't have occurred if [Danilyants] would have extended the incision and got an intra-operative consultation by a specialist." *Id.* at 115–116.

Though Dr. McCarus agreed that  "Even if you do the right thing, you can have a complication,"[5] he clarified, "But in this case, looking at the record, I think she wasn't able to really properly do the surgery in a standard manner that would benefit the patient because of the lack of exposure, working in a small opening and not properly being able to do the surgery in a safe manner." *Id.* at 67–69 [emphasis added].

Dr. McCarus further testified:

Q. Doctor, in your opinion to, a reasonable degree of medical certainty, if Dr. Danilyants had complied with the standard of care as you've just described it, including extending the incision, in other words, converting to open and bringing in an intra-operative consultant, in your opinion, more probably than not, would she have suffered the two bowel perforations, the infection, the ileostomy, and the take-down procedure? [emphasis added]
…
The WITNESS: She would not.
Q. And tell us why you say that?
…
THE WITNESS: If you extend the incision, you have better visibility, better access, the ability to look at the adjacent structures than working through a very small incision. If you bring in a consultant who is an expert in dealing with the bowel, there is less risk of injuring the bowel because they are familiar with this type of surgery where things are distorted and stuck to one another and that's their specialty. So it would decrease the risk of injuring the bowel.
*Id.* at 102–103.

Q. In your opinion, if Dr. Danilyants had met the standard of care, to a reasonable degree of medical probability, would Ms. Sandoval need diagnostic laparoscopy and adhesiolysis in the future?
…
And what is your opinion in that regard?

---

[5] *See also* Trial Tr. vol. 3, 124:
Q. We can agree, can we not, that bowel perforations in abdominal procedures such as this, such as a myomectomy or a hysterectomy or other abdominal procedures, bowel perforations can occur with no negligence whatsoever, correct?
A. Yes.
Q. Bowel perforations can occur and not be discovered by the surgeon and there be no negligence at all, correct? That can occur, correct?
A. That can occur, yes.

A. My opinion is that the adhesions are directly related to the injury that was sustained by the original myomectomy, and if it was done properly and those complications would not have occurred, she would not need a laparoscopy and wouldn't have had the issue around bowel obstructions.
*Id.* at 110–111.

Dr. McCarus also testified that bowel perforations are quite rare and that multiple perforations are even more notable. *Id.* at 68.

Defendants argue that Dr. McCarus' testimony is nonetheless deficient because he did not testify that, *inter alia*, had Danilyants complied with either component of the standard of care – extending the incision or calling in a consult – the injuries would not have happened. On cross examination, defense counsel quoted sections of Dr. McCarus' deposition where he declined to state, to a reasonable degree of medical certainty, that each of the standard of care elements at issue – extending the incision and calling in a consult – would have, independently, prevented the injuries.[6] In other words, Defendants argue that because he did not say that extending the incision

---

[6] Extending the incision
Q. Page 103, beginning at line 5, for the record.
"Question: Is it your opinion, sir, that the injury would not have occurred if she, meaning Dr. Danilyants, had extended the incision?" Stop there for a second. You understood at the time that question was posed to you that the questioner, the attorney from my office asking you the question, was simply trying to find out from you whether you could say to a reasonable degree of medical probability or not that extending the incision would have changed the outcome?
A. Correct.
Q. You understood that to be the meaning of the question, correct?
A. Yes.
Q. All right. So let's go on. "Question: Is it your opinion, sir, that the injury would not have occurred if Dr. Danilyants had extended the incision?"
Your answer: "Well, to answer the question, I think the injury wouldn't have occurred if she would have extended the incision and got an intra-operative consultation by a specialist."
So stop there. Have I read the question and answer correctly?
A. Yes.
…
Q. And that was the testimony you gave at the time under oath, correct?
A. Yes, sir.
Q. And then the questioning went on. So starting on line 12, "Okay. Right now I'm just asking about extending the incision."
Your answer on line 14: "I cannot, with a medical degree of probability, tell you that extending the incision would have prevented an injury."
That was your full and complete answer to that question, wasn't it?

alone would have prevented the injuries, or calling in a consult alone would have prevented the injuries, his testimony was inadequate to show causation.

The Court disagrees.

Dr. McCarus explained that in this case the standard of care had two parts, taken together – both failure to extend the incision <u>and</u> failure to call in the consult – breached the standard and together were, "to a reasonable degree of medical certainty," more likely than not, the cause of Sandoval's injuries. Trial Tr. Vol. 3, 102. On redirect examination he explained, citing his deposition testimony:

> Q. And then Mr. Vaughan went on to read down lower on page 103 and into 104 about trying to separate out extending the incision with getting an intra-operative consultation, and you said, "You need to know what my thought process was." But you didn't get an

A. Yes. And that's true.
Q. Yes. It was your full and complete answer to that question given under oath, correct?
A. Yes, sir.
Q. It was truthful testimony as of April 5, 2018, in response to a direct question, wasn't it?
A. Yes.
Q. It is truthful answer -- truthful testimony today, isn't it?
A. Yes.
Trial Tr. Vol. 3, 115-117.
…
Q. As you sit here on the stand today, you cannot tell the … jury under oath that you have an opinion, to a reasonable degree of medical probability, that had Dr. Danilyants extended the incision, it would have resulted in a different outcome. You cannot say that, can you?
A. I cannot and the reason I cannot, because you can extend the incision and still not do proper surgery and still have an injury.
*Id.* at 118

Calling in a consult
Q: "Answer: I can't give you details on how consulting a general surgeon would have benefited things, but I can tell you that the standard of care in a case like this requires you to ask for help and get somebody in there who knows how to handle the bowel."
So have I read those answers correctly?
A. You did.
Q. Have I read them thoroughly?
A. You did.
Q. And they were truthful at the time you gave them; is that correct?
A. That's correct.
*Id.* at 119:7-120:13.

opportunity to tell us what your thought process was. I'm giving you that opportunity now, sir. Tell me how those answers later on are consistent with or not consistent with the answer you gave up on 103.

A. Yeah, I mean, you want to extend the incision. I think that was the correct thing to do so you have better access to the anatomy, to the tissue, but even with extending the incision, you can still have an injury. So that was my thought. I mean, the risk is less, but I don't know if I can say it with a medical probability.

But I do think the approach will decrease the risk. And then if you add bringing a consultant in to handle that bowel, the risk is going to go way down, and that was how I answered that question.

Q. And the risk being way down, way below 50 percent?

A. Yes.

Trial Tr. vol. 3 at 141-142.

That each component, by itself, might not constitute the cause of the injuries does not defeat causation, as made clear by cases which have articulated standards of care that required multiple steps. *See, e.g., Lawson v. United States*, 454 F. Supp. 2d 373, 405 (D. Md. 2006) (summarizing breach of standard of care as consisting of three elements – timely diagnosis, pregnancy managed as high risk, and performance of surgery shortly after cesarean delivery. If all these steps had been done, plaintiff would not have had the injuries she suffered).

Indeed, everyday experience supports the conclusion that an expert could testify that in a medical malpractice case he believes it more likely than not to a reasonable degree of medical certainty, that had a doctor followed two steps consistent with a standard of care, the injuries would have been prevented, whereas following just one of the steps might not suffice to be able to conclude that the injury would have been prevented. An easy example comes to mind. The driver of an automobile who is speeding, drives through a stop sign without stopping, while sending a text message, collides with another vehicle. Did the speeding, the failure to stop at the stop sign, or the texting cause the collision? Any witness, expert or not, might be able to testify that each one of these acts violated the driver's duty of care but at the same time hesitate to say that each breach independently caused the crash. Taken together, however, the combination of breaches, could

easily lead the individual to testify to causation with a reasonable degree of appropriate certainty. Collectively, more likely than not and to a reasonable degree of certainty, all the breaches would be assigned as the cause of the collision.

Courts have long recognized complicated and connected aspects of causation in medical malpractice cases. Indeed, a defendant's negligence need not even be the sole cause of an injury, *see Young v. United States*, 667 F. Supp. 2d 554, 561 (D. Md. 2009), *citing Atl. Mut. Ins. Co. v. Kenney*, 323 Md. 116, 127, 591 A.2d 507, 512 (1991); *Stickley v. Chisholm*, 136 Md. App. 305, 314–15, 765 A.2d 662, 668 (2001), and an injury may have more than one "proximate cause," *id., citing Karns v. Liquid Carbonic Corp.*, 275 Md. 1, 20, 338 A.2d 251, 262 (1975).  The Court is not persuaded by Defendants' contention that Dr. McCarus was required to testify that the breach of each element of the standard of care independently, if followed, would have occasioned Sandoval's injuries.

Defendants also make much of Dr. McCarus' "concession," as they put it, that bowel injuries may occur absent negligence. In *Ford v. United States*, 165 F. Supp. 3d 400, 427 (D. Md. 2016), following a bench trial, the court confronted a similar argument, i.e., that because there could have been causes of the injuries unrelated to the breaches of the standard of care testified to in that case, the plaintiff had failed to show causation. There the alleged violation of the standard of care was the physician's failure to treat the plaintiff for hypertension. A defense expert testified that treating hypertension would not have prevented injuries because the condition which caused the injury could also be found in non-hypertensive patients. The court found this testimony did not trump the preponderance of evidence in the case that hypertension was the underlying cause of condition that caused injuries.

The court explained:

> Ultimately, to rule for the Government on the issue of causation would require the Court to say that, despite having severe hypertension that was not adequately treated and more likely than not having preeclampsia that went undiagnosed, Ms. Ford coincidentally had another unrelated condition that caused her to have a brain bleed and that such condition was missed by all of the doctors evaluating her at the time. The Court, of course, cannot definitively refute that possibility. But it need not do so in order to rule for the Plaintiffs. Thus, the Court concludes that it is more likely than not that Ms. Ford's untreated hypertension and undiagnosed preeclampsia caused the injuries she sustained on September 29, 2009.

A "plaintiff is not required to show the exact cause of injuries or to exclude all possibility that they resulted without fault on the part of the defendant." 61 Am. Jur. 2d Physicians, Surgeons, Etc. § 333. Here, Dr. McCarus testified that in his view, in this case, to a reasonable degree of medical certainly, more probably than not the breaches of the blended standard of care, taken together, caused Sandoval's injuries. Given the rarity of such injuries as occurred here, and his additional testimony as to the lack of "exposure" through the small incision, the extent of the adhesions beyond those typically encountered by gynecological surgeons, and the location of the injuries, the jury had ample testimony from which it could conclude, as Dr. McCarus believed, that Sandoval's injuries were not inevitable, that they could have been prevented if Danilyants had followed the blended standard of care. *See Ford*, 165 F. Supp. 3d 400 ("A medical malpractice plaintiff's evidence of proximate cause may be found legally sufficient even if his or her expert is unable to quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased injury as long as evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased injury.").

Moreover, as for calling in a consult, "it is generally accepted that a medical practitioner – although licensure alone entitles him or her to practice in any field of medicine – fails to adhere to

generally accepted standards of care if he or she attempts to diagnose or treat symptoms that require referral to a particular specialist." *See Roberts v. Fleury*, 987 F. Supp. 940, 941 (D. Md. 1997), *aff'd,* 166 F.3d 334 (4th Cir. 1998). *See also Malpractice: physician's failure to advise patient to consult specialist or one qualified in a method of treatment which physician is not qualified to give*, 35 A.L.R.3d 358 (2021) (recognizing that "a number of cases have held or recognized that a physician's duty to advise his patient to consult a specialist, or one who might furnish other or better treatment, arises when the physician knows, or should know, that he does not possess the requisite skill, knowledge, or facilities to properly treat a patient's ailment."). Dr. McCarus explained that handling complex bowel adhesions is "beyond the scope" of a gynecological surgeon and, while depending on how the bowel injury occurred – i.e., from pressure, burning, pulling – it may or may not have been detectable at the time of surgery, calling in a consult to handle the adhesions and check the bowel, in addition to extending the incision, most likely would have prevented Sandoval's injuries. Trial Tr. vol. 3, 42; 138-39.

As for testifying to a reasonable degree of medical certainty, again Defendants' attack on this point again hinges on Dr. McCarus' disinclination to say that each independent act would have caused the injury. But that was not the standard of care that Dr. McCarus was proposing. He identified both extending the incision <u>and</u> calling in a consult as constituting the standard of care, and as to that standard, his testimony was given to a reasonable degree of medical certainty. To repeat: when asked "Doctor, <u>in your opinion to, a reasonable degree of medical certainty,</u> if Dr. Danilyants had complied with the standard of care as you've just described it, including extending the incision, in other words, converting to open and bringing in an intra-operative consultant, in your opinion, more probably than not, would she have suffered the two bowel perforations, the

infection, the ileostomy, and the take-down procedure?" [emphasis supplied] he answered, "She would not." Trial Tr. vol. 3, 102-103.

Defendants also argue that Dr. McCarus' testimony as to causation lacked the requisite certainty because it focused on risk reduction, not causation. To be sure, Dr. McCarus stated that the surgeon would "want to extend the incision" because "the risk is less." The jury, however, could have plausibly understood the testimony regarding risk as explaining why the standard of care was such as it was. When it came time to say whether following that standard would have made a difference – Dr. McCarus was clear enough, as the Court has already noted, that having done both acts, together, to a reasonable degree of medical certainty would have changed the outcome. Having done neither, the negative outcome was the result. Insofar as the "risk reduction" testimony may have constituted hedging by Dr. McCarus, that goes to his credibility, an issue left for the jury.

The jury also heard testimony from Dr. Hovey that numerous mechanisms that can cause a bowel perforation, including heat, pressure, and cutting. Dr. McCarus testified that based on the location of Sandoval's injuries – on her rectum in particular – absent a larger incision, visibility and maneuverability would have been obstacles to safely performing the surgery. He testified that, given the significant adhesions to the bowels, they should have been checked, particularly given the amount of bleeding and poor exposure as Danilyants was taking down the adhesions. *Compare March v. United States*, No. 3:17-CV-2028 (VAB), 2021 WL 848723, 24 (D. Conn. Mar. 5, 2021) (finding expert testimony that violation of standard of care to perform third and final check of bowels in laparoscopic surgery more likely than not caused plaintiff's injuries established proximate cause; even though there was testimony that some burn injuries may not be detected, there was not enough evidence in record to conclude plaintiff's injuries would not have been

discovered). Indeed, "[p]laintiffs are not required to prove that the injury would certainly have been detected by this final inspection, only that this failure, a violation of the standard of care as discussed above, more likely than not caused [the] injuries." *Id.., citing Arroyo v. Univ. of Connecticut Health Ctr.*, 175 Conn. App. 493, 515, 167 A.3d 1112 (2017) (noting that plaintiff "is not required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident."). And finally, yet again, Dr. McCarus stated that had Danilyants extended the incision <u>and</u> called in a consult, more likely than not Sandoval's injuries would not have occurred.

In the Court's view, Dr. McCarus' testimony was not "so speculative or conjectural that a reasonable jury could not rule in favor of the plaintiff." *Samuel*, 112 F. Supp. 2d 460. The federal rules do not require "[t]he expert to testify with absolute certainty, or without any doubt whatsoever." *Samuel*, 112 F. Supp. 2d 460. An expert's lack of certainty goes to the weight of his or her testimony, *see Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993),  and credibility questions are left to the jury, s*ee Reeves*, 530 U.S. at 150; *Samuel*, 112 F. Supp. 2d at 469 ("The jury evaluates the expert's credibility and decides what weight to give to his or her testimony, in the light of the court's instructions on the law. Although [expert] opinion has been admitted into evidence, the jury is free to reject it totally, accept it in part, or in whole. Thus, even if the court was convinced that the expert's testimony was reliable and certain, the jury would be free to ignore it if they felt it was improperly speculative, or otherwise lacking in weight.").

The Court is satisfied that there was adequate testimony supporting Dr. McCarus' opinion, to a reasonable degree of medical certainty, that violation of a standard of care calling for extending the incision <u>and</u> bringing in a consult, made it "more likely that the defendant's negligence was the cause than any other case." *See Owens by Owens*, 766 F.2d at 150. *Compare Fitzgerald, supra*

(insufficient evidence where expert gave contradictory testimony and could not state negligence caused injuries); *Owens by Owens*, 766 F.2d at 150 (evidence overall insufficient where numerous occasions of oxygen exposure could have caused infant's blindness, but expert testimony was limited to just two exposures).

Viewing the record as a whole in favor of Sandoval, as the Court is obliged to do, there was sufficient evidence for the jury to conclude that it was more likely than not that Danilyants' failure to extend the incision and call in a consult caused Sandoval's injuries, when she breached her duty of care, an opinion that Dr. McCarus expressed to a reasonable degree of medical certainty. *Riggins*, 800 F. App'x at 156–157, *citing Fitzgerald*, 679 F.2d at 348–50. In sum, Defendants' Renewed Motion for Judgment as a Matter of Law (ECF No. 111) therefore is **DENIED**.

### b.  Motion for Remittitur

Defendants have also moved, pursuant to Fed. R. Civ. P. 59(e) and the Maryland Health Care Malpractice Claims Act, *Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01 (LexisNexis 2020) et seq.* (the Act), for the Court to amend the Final Order of Judgment. Specifically, they request that the judgment be amended by: (1) reducing the jury award for non-economic damages to the applicable Maryland statutory cap on non-economic losses pursuant to § 3-2A-09(b)(1) of the Act; (2) by reducing the jury award for past medical expenses to the total amount actually paid by or on behalf of the Plaintiff pursuant to § 3-2A09(d)(1) of the Act; and (3) by reducing the jury award for past medical expenses by subtracting amounts awarded for medical expenses which were not causally related to the alleged negligence and were not necessary to treat Sandoval's cecal and rectal perforations. The parties ultimately agree that the first two reductions are appropriate. They

disagree as to the third requested reduction, i.e., for expenses that Defendants contend were not proximately caused by the negligence at issue. Nevertheless, the Court addresses all three proposed reductions.

As for reduction pursuant to the statutory cap on non-economic losses, the relevant statute provides the following:

> [a] Verdict … for noneconomic damages for a cause of action arising between January 1, 2005, and December 31, 2008, inclusive, may not exceed $650,000 [which] limitation on noneconomic damages … shall increase by $15,000 on January 1 of each year beginning January 1, 2009. The increased amount shall apply to causes of action arising between January 1 and December 31 of that year, inclusive.
>
> Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09(b)(1).

The Act mandates that "[i]f the jury awards an amount for noneconomic damages that exceeds [the Act's] limitation . . . the court shall reduce the amount to conform to the limitation." Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09(c)(2). Application of the cap to any verdict for noneconomic damages is mandatory. *See Lockshin v. Semsker*, 412 Md. 257, 283, 987 A.2d 18, 33 (2010).

Sandoval's cause of action arose in 2015, when the applicable statutory limitation on noneconomic damages recoverable under the Act was $755,000. The parties agree that $755,000 is the maximum noneconomic award available to Sandoval. The Court, therefore, will reduce the jury's initial award of $928,928.96 in non-economic damages to $755,000.

As for reducing the award for past medical expenses, § 3-2A09(d)(1) of the Act provides that:

> A verdict for past medical expenses shall be limited to:
> (i) The total amount of past medical expenses paid by or on behalf of the plaintiff;

and

(ii) The total amount of past medical expenses incurred but not paid by or on behalf of the plaintiff for which the plaintiff or another person on behalf of the plaintiff is obligated to pay.

Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09(d)(1).

The jury's verdict for past medical expenses in this case, totaling $529,571.04, reflected amounts billed rather than amounts actually paid or obligated to be paid by or on behalf of Sandoval. *See* Exhibit A, P's Tr. Ex. 11 – Billing Summary. As Defendants explain, in order to avoid presentation of collateral source evidence to the jury, evidence of payments subject to § 3-2A-09(c)(2) is considered by the court post-verdict. *See Lockshin v. Semsker*, 412 Md. 257, 285, 987 A.2d 18, 34 (2010).

Sandoval agrees that some reduction of the award for past medical damages is warranted and submits that the total paid by her or on her behalf, $288,828.40, should be confirmed. Defendants argue that this total is still too high because it includes costs that were not caused by the negligence of Defendants.[7]

Thus, Defendants suggest that Sandoval should not recover the costs of (i) the amounts billed for the at-issue surgery; or (2) the amounts incurred by Sandoval for fertility testing. Defendants argue that it is axiomatic that any damages recoverable in a negligence action must be proximately caused by a negligent act or omission of a defendant. *See, e.g., McAlister v. Carl*, 233 Md. 446, 452, 197 A.2d 140, 143 (1964). The at-issue surgery, they say, was necessitated by

---

[7] The Court notes that there is some discrepancy between the total amount paid by or due from Sandoval or her insurance as reflected in the exhibits submitted by Sandoval and Defendants. *See* ECF No. 114-2; ECF No. 116-1. Sandoval submits that the total paid by or due from her or her insurance (including the at-issue surgery), is $288,828.40. Defendants submit this total is $224,516.83. Some portion of this, but not all, can be explained by Defendants' non-inclusion of the at-issue surgery. As the party moving to reduce the verdict, the burden is on Defendants and they have not provided further support demonstrating that amounts paid or due are less than Sandoval says. The Court, therefore, calculates its reductions based on Sandoval's exhibit.

Sandoval's pre-existing medical condition – the fibroids. Thus, any amounts billed for the at-issue surgery would have been necessary regardless of any negligence. Accordingly, Defendants argue, the jury's award for past medical expenses should be reduced by the amounts billed for the at-issue surgery, totaling $43,107.36.

As to the fertility testing expenses, Defendants argue that these expenditures are not recoverable because there was no evidence, in the form of competent expert testimony, offered to establish that they resulted from any negligence on the part of the Defendants. In fact, Defendants argue that this very issue was determined by the Court prior to trial when the Court granted Defendants' motion to preclude any testimony regarding infertility from Sandoval's expert, Dr. McCarus. *See* ECF Nos. 56, 72, and 73. Because there was no expert testimony to support the recoverability of Sandoval's fertility testing as an item of damages, the jury's award for past medical expenses should be reduced by the amounts billed for said fertility testing, totaling $4,060.00.

Sandoval responds that the jury found that all of the medical expenses included in her Exhibit 11 were "proximately caused" by Defendants' negligence, and that the Court should not disturb this finding beyond adjusting the total for the amounts actually paid by or still due from insurance or herself. As for the costs for the at-issue surgery, Sandoval argues that these are recoverable, essentially, on a theory of contract: She says she paid Defendants to perform minimally invasive myomectomy surgery with reasonable care and that this was not done. She submits that, while in medical malpractice cases, Maryland law precludes a separate cause of action for breach of implied contract and instead provides that the issue be subsumed within a medical negligence claim, *Benson v. Mays*, 245 Md. 632, 636–38, 227 A.2d 220 (1967), where a physician makes a separate "special promise or warranty" Maryland law allows an action for

breach of contract for breach of that promise. *Dingle v. Belin*, 358 Md. 354, 372, 749 A.2d 157 (2000). The apparent implication is that Defendants in some way made a special promise or warranty here.

As to the fertility testing, Sandoval argues that Dr. McCarus testified that the medical bills in Sandoval's Exhibit 11, including the fertility testing, reflect care necessitated by the breaches of the standard of care. Trial Tr. vol. 3, 104-105. Moreover, she argues, it is not accurate that these expenses were excluded prior to trial; rather, Sandoval was precluded from claiming she suffered infertility as a result of the negligence. Notably, she sought no recovery for expenses for infertility treatment, only expenses for fertility testing.

The Court considers each expense in turn.

Starting with the at-issue surgery, Defendants have the better argument. Sandoval may not recover that expense under a theory of contract. The Court finds that the only recovery available in this case is in tort. "As the Maryland Court of Appeals has recognized, '[t]he great majority of courts . . . have concluded that medical malpractice actions sound in tort, and not in contract.'" *Hood v. Lab'y Corp. of Am.*, No. CCB-04-3870, 2006 WL 1555083, at *3 (D. Md. June 1, 2006), *certified question answered,* 395 Md. 608, 911 A.2d 841 (2006), citing *Benson*, 227 A.2d at 223. Sandoval has not shown that any special warranty was made here that would permit the recovery see seeks. *Compare Heneberry v. Pharoan*, 232 Md. App. 468, 481, 488–89, 158 A.3d 1087 (2017) (affirming dismissal of claim for breach of contract where asserted breach was failure to perform appendectomy properly and in accordance with medical standards, resulting in a portion of the appendix remaining in the body requiring subsequent surgery; plaintiff alleged no special warranty or promise beyond contract to perform appendectomy).

As stated, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09(d)(1) provides that a plaintiff may only recover amounts actually paid or due to be paid by the plaintiff or on their behalf. *See* Dan B. Dobbs, Paul T. Hayden, Ellen M. Bublick, *The Law of Torts* § 482 (2d ed. 2011) ("The traditional collateral source rule allows the plaintiff to recover from the tortfeasor all the reasonable medical expenses necessitated by the tort, including … [charges] paid on the plaintiff's behalf by the plaintiff's insurer").  Defendants do not address the costs paid by or on behalf of plaintiff for the at-issue surgery, simply writing "not recoverable" in their exhibit. ECF No. 116-1. Plaintiff, however, submits that she or her insurance paid $28,921.46 for the surgery costs. ECF No. 114-2. Thus, at a minimum, her recovery for this surgery would need to be reduced to the amount actually paid. Defendants, having failed to provide this information, may not have sustained their burden as the moving party, but regardless of whether the costs were actually paid by or on behalf of Sandoval, commonsense confirms that Sandoval should not recover for the at-issue surgery at all, since it was caused not by Defendants' negligence, but instead by Sandoval's underlying health condition. *Hurley v. United States*, 923 F.2d 1091, 1099 (4th Cir. 1991) ("In order to establish the causation element in a medical negligence cause of action, plaintiff must show by a preponderance of the evidence that the defendant's breach of duty caused the patient to suffer an injury."). Sandoval would have needed a myomectomy regardless of the ultimate negligence of Defendants. *See, e.g., Wright v. Smith*, 641 F. Supp. 2d 536 (W.D. Va. 2009) (plaintiff could not recover for initial appendicitis surgery, during which negligence occurred, because "no negligence by [defendants] caused [plaintiff] to have to undergo an appendectomy"; recovery would constitute a windfall to plaintiff and be unfair to defendants).

Defendants are correct: the costs of the myomectomy were not caused by Danilyants' negligence.  *See Phillips v. Gerhart*, 2002 PA Super 175, 801 A.2d 568, 576–77 (2002) (finding

no abuse of discretion where trial judge "excluded those expenses that would have accrued to Appellee regardless of Appellants' negligence"). *But see Moorhead v. Crozer*, 564 Pa. 156, 163-64 (2001), *abrogated on other grounds by Northbrook Life Insurance Co. v. Commonwealth of Pennsylvania,* 597 Pa. 18, 25-26 (2008) (holding hospital tortfeasor, who treated decedent for injuries that occurred on hospital property, could not be liable for portion of bill written-off but was otherwise liable).

Accordingly, the jury's award for past medical expenses will be reduced by the $28,921.46 cost of this surgery.

As for the fertility testing, Sandoval has the more compelling argument. She is not seeking reimbursement for fertility treatment, only for fertility testing. After the surgery and damage suffered, it is reasonable that she would want to investigate whether there had been any impact on her fertility. The test she pursued constituted an appropriate, proximately-caused "diagnostic" cost. *See* 64 Am. Jur. Trials 1 (Originally published in 1997), Gynecological Malpractice Litigation, Daniel J. Penofsky (listing "diagnostic laboratory fees" in sample gynecological malpractice damages worksheet for compensatory damages). The fertility test costs, totaling $4,060.00, therefore, will not be removed from the award.

Summing up, the Motion for Remittitur is **GRANTED IN PART** and **DENIED IN PART**. It is granted to the extent that the noneconomic damages will be reduced to $755,000.00. Past medical expenses will be reduced by the actual cost of the myomectomy itself, $28,921.46, leaving

a total for medical expenses of $259,906.94, after adjusting the original jury award for amounts billed to reflect amounts actually paid by or on behalf of Sandoval.[8]

## VI. Conclusion

For the foregoing reasons, the Court concludes that the jury verdict in favor of Sandoval must stand based on Dr. McCarus' testimony that Defendants breached the standard of care, and that the breach caused Sandoval's injuries. The Renewed Motion for Judgment as a Matter of Law, therefore, ECF No. 111, is **DENIED**.

The jury award for non-economic damages must be reduced to Maryland's statutory cap on noneconomic damages, and the award for past medical expenses must be reduced to reflect the total amount actually paid by or due from Sandoval or her insurance, rather than the amount billed by the various health care providers. It must also be reduced by removing the cost of the at-issue surgery, which was required independent of any acts of Defendants. Therefore, the Motion for Remittitur, ECF No. 112, is **GRANTED IN PART** and **DENIED IN PART**. Judgment in favor of Sandoval is reduced to a total of $1,056,406.94, consisting of $755,000 in non-economic damages, plus $41,500 in lost wages, plus $259,906.94 in past medical expenses actually paid or due (excluding the at-issue surgery).

An Order implementing the Court's decisions will be **ENTERED**. Since no other motions remain, the Clerk will be directed to **CLOSE** the case.

---

[8] The total billed for the myomectomy was $43,107.36. Defendants do not provide a break down of how much of this cost was actually paid by or due from Sandoval or her insurance. Sandoval, however, submits that she or her insurance paid $28,921.46. ECF No. 114-2. $288,828.40 (total amount paid by Sandoval or insurance for past medical expenses) minus $28,921.46 (amount paid by Sandoval or insurance for myomectomy) equals $259,906.94.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

May ___, 2022